Brian J. Miller
Morrison, Sherwood, Wilson & Deola PLLP
P.O. Box 557
401 North Last Chance Gulch
Helena, Montana 59624-0557
(406) 442-3261
bmiller@mswdlaw.com

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| MIRIAM ROJAS-ROSAS and JULIO LADISLAO SANTIAGO-ORTIZ.<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, BY AND THROUGH U.S. CUSTOMS AND BORDER PROTECTION.<br><br>Defendants. | Case No. CV-18-62-GF-BMM-JTJ<br><br><br>**COMPLAINT** |

Plaintiffs Miriam Rojas-Rosas and Julio Ladislao Santiago-Ortiz ("Plaintiffs") allege as follows:

## INTRODUCTION

1.  Miriam Rojas-Rosas and Julio Ladislao Santiago-Ortiz are a married couple whose rights were egregiously violated by U.S. Customs and Border Protection ("CBP") officers at the Havre, Montana Field Office when they unlawfully arrested and detained the couple on April 12, 2016.  As described below, both Ms.

Rojas-Rosas and Mr. Santiago-Ortiz possessed valid immigration documents to prove their lawful status, and yet Ms. Rojas-Rosas was detained for over 24 hours, and Mr. Santiago-Ortiz was also held and interrogated, without any lawful basis. Ms. Rojas-Rosas had been granted protection from deportation through the deferred action for childhood arrivals ("DACA") program. Mr. Santiago-Ortiz had a valid visitor's visa, and his term of admission was unexpired.  CBP willfully ignored their valid immigration documents and detained the Plaintiffs.  At the time of her detention, Ms. Rojas-Rosas was four months pregnant, and CBP officers caused her and her husband significant emotional distress through their abusive and unlawful tactics.

2. Plaintiffs bring claims against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680, for false imprisonment and false arrest, intentional infliction of emotional distress, and negligence.

## JURISDICTION AND VENUE

3.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331; 1343; and 1346.

4.   Venue properly lies within the District of Montana, and in the Great Falls division, because a substantial part of the events or omissions giving rise to this action occurred in and near Havre, Montana, within the Great Falls Division. *See*

28 U.S.C. § 1391(b)(2), (e); Local Rules 1.2(c) and 3.2(b).

5.  On April 6, 2017, Plaintiffs submitted an administrative claim for the claim set forth below to Customs and Border Protection, part of the Department of Homeland Security.

6.  Six months having elapsed, all conditions precedent to filing a claim under the Federal Tort Claims Act have been met.

7.  No petition for habeas corpus has previously been filed in any court and no removal/deportation proceedings are pending against either Plaintiff.  There is no venue, apart from federal court, in which to provide a remedy to Plaintiffs.

## PARTIES

8.    Plaintiff Miriam Rojas-Rosas is a twenty-two year old citizen of Mexico and a resident of Portland, Oregon.  At all times relevant hereto, she was the recipient of DACA status, provided by U.S. Citizenship and Immigration Services ("USCIS"), an agency within DHS.

9.    Plaintiff Julio Ladislao Santiago-Ortiz is a twenty-three year old citizen of Mexico and a resident of Portland, Oregon.  At the time of his arrest, he was present in the United States with a valid visitor's visa.

10.    The United States of America ("United States") is a sovereign sued under the FTCA, under which the United States has waived its sovereign immunity

for the tortious acts or omissions of its agents, including agents acting within the scope of their employment with U.S. Customs and Border Protection ("CBP"), a component of the United States Department of Homeland Security ("DHS").

## FEDERAL TORT CLAIMS ACT JURISDICTION

11.    The FTCA waives the United States' sovereign immunity and authorizes suits for money damages based on the negligent or intentional acts or omissions of federal employees, made within the scope of the employee's or law enforcement officer's employment or office. *See* 28 U.S.C. §§ 1346(b), 2671 et seq.; 28 C.F.R. §§ 14.1-14.11.

12.    The FTCA covers negligent conduct by federal employees and intentional torts committed by "investigative or law enforcement officers." *See* 28 U.S.C. § 2680(h) (defining "investigative or law enforcement officer" as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law").

13.    This includes immigration officers employed by the Department of Homeland Security (DHS), including its component agency, U.S. Customs and Border Patrol ("CBP"). *See* Immigration and Nationality Act § 287(a)(2), 8 U.S.C. § 1357(a)(2) (authorizing warrantless arrests by DHS officers); 8 C.F.R. § 103.1(b) (defining immigration officers); 8 C.F.R. §§ 287.5(c)&(d) (addressing power and

authority of immigration officers to arrest and conduct searches).

14.    Pursuant to the FTCA, the Plaintiff presented a timely written claim to DHS on or about April 6, 2017.  *See* 28 U.S.C. § 2401(b); 28 C.F.R. § 14.1 *et seq*. On or about August 24, 2017, DHS responded with a request for additional evidence regarding the Plaintiff's injuries.    Under 28 U.S.C. § 2675(a), "[t]he failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section."

## GENERAL ALLEGATIONS

15.    Julio Ladislao Santiago-Ortiz entered the United States as a B-2 visitor, using a valid Border Crossing Card.  He last entered the United States on or around November 13, 2015, at the San Ysidro, CA port of entry.  At the time that he was stopped by CBP, his admission period was still valid.

16.    During a previous visit to the United States, Mr. Santiago-Ortiz had begun a romantic relationship with Miriam Rojas-Rosas, a Mexican citizen who had valid federal immigration status under DACA.

17.    Regarding DACA, in 2012, the federal government promised that the program would "lift the shadow of deportation" for the young men and women who received it.  Barack Obama, Remarks by the President on Immigration (June

15, 2012), *available at* http://www.aila.org/infonet/wh-president-speech-deferred-action. In her memorandum announcing DACA, then Secretary of Homeland Security Janet Napolitano set forth several criteria that, if satisfied, would allow an individual to be considered for DACA. *See* Memorandum from Janet Napolitano, Secretary, Department of Homeland Security, to David V. Aguilar, Acting Commissioner of U.S. Customs and Border Protection et al., *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*, 1 (June 15, 2012), *available at* https://www.dhs.gov/publication/memorandum-deferred-action-process-young-people-who-are-low-enforcement-priorities.

18.     These criteria are that the individual: (1) "came to the United States under the age of sixteen"; (2) "has continuously resided in the United States for at least five years preceding [June 15, 2012] and is present in the United States on th[at] date . . ."; (3) "is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States"; (4) "has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety"; and (5) "is not above the age of thirty" as of June 15, 2012. The memo directed all agencies within DHS to exercise discretion on a case-by-case

basis to ensure that these low priority individuals are not removed from the United States.

19.    At the time of the Plaintiffs' arrests by CBP, DACA was in full effect. Although President Donald Trump has since ended the DACA program, DHS continues to exempt DACA recipients from the new enforcement priorities. Memorandum from John Kelly, Secretary, Department of Homeland Security, to Kevin McAleenan, Acting Commissioner of U.S. Customs and Border Protection et al., *Enforcement of the Immigration Laws to Serve the National Interest*, 2 (Feb. 17, 2017), *available at* https://www.dhs.gov/publication/enforcement-immigration-laws-serve-national-interest.

20.    When Mr. Santiago-Ortiz met Ms. Rojas-Rosas, she was living in Oregon.  However, she later moved to Glasgow, Montana.  Therefore, upon his admission as a visitor, Mr. Santiago-Ortiz took a bus to Montana to visit with his girlfriend.  The couple decided to get married in Glasgow, Montana on March 3, 2016.

21.    At the time of the incident that gave rise to this claim, Ms. Rojas-Rosas was four months pregnant.

22.    On or around April 1, 2016, Ms. Rojas-Rosas' employer allowed her and her husband to borrow his truck.  The newly-married couple planned to drive

to California to visit Mr. Santiago-Ortiz's family.  While they were there, they learned that an uncle, Jose Angel Ortiz Marroquin, was also in California and wanted to see him.  After they met, Mr. Santiago-Ortiz asked his uncle if he wanted to return with them to visit Glasgow, Montana for a few weeks.

23.     As mentioned, Mr. Santiago-Ortiz was here on a valid visitor's visa, but he was scheduled to return to Mexico in a few weeks.  The plan was for his uncle to visit in Glasgow, and then they would return to California together, so that Mr. Santiago-Ortiz could drive back to Mexico prior to the expiration of his admission as a tourist.

24.     The uncle, Mr. Ortiz Marroquin, agreed to come visit but asked if his friend and travel companion, Alberto, could also join them.  This is how these four individuals came to be in the same vehicle on the day that they were arrested by CBP on April 12, 2016.

25.     Mr. Santiago-Ortiz was the driver, and Ms. Rojas-Rosas was in the passenger seat.  The uncle and his friend were in the back seats.  Around 3:44 pm. their truck was initially pulled over by Montana Highway Patrol on Highway 87 in Choteau County, Montana.  Trooper Lewis Johnson stated that the purpose of the stop was speeding, as the Trooper believed the vehicle to be travelling at 79 miles per hour in a 70 mile per hour zone.

26.    Trooper Johnson stated he "could sense [a] language barrier" quickly engaged in questioning about where the passengers were from and what brought them to Montana. Mr. Santiago-Ortiz provided the vehicle registration, but could not initially locate proof of insurance.  Trooper Johnson informed Mr. Santiago-Ortiz that he would "issue a warning for failure to provide proof of insurance." Proof of insurance was subsequently produced by Plaintiffs.

27.    Trooper Johnson subsequently asked for identification from all three passengers in the vehicle, without any probable cause or reasonable suspicion that the passengers committed any crime or offense.

28.    After collecting IDs and returning to his vehicle, Trooper Johnson requested that both Sergeant Jason Wickum with the Montana Highway Patrol, and a Choteau County Sherriff's Deputy, respond to the scene.  According to Sergeant Wickum, Trooper Johnson wanted backup due to the "sensitive nature" of the stop.

29.    The incident report states: "There were issues that lead me to believe that there was more going on than four people traveling from California to Glascow[sic] Montana. The registered owner of the vehicle was not present in the vehicle. My training and experience has shown me that this is sometime and [sic] indicator of illegal activity like transporting drugs. The silent and stem nature of Mr. Contreras and Mr. Marroquin throughout this traffic stop made me nervous. Mr. Contreras and Mr. Marroquin also seemed hesitant to provide me with

identification and only provided it after I Informed them that the lack of it was suspicious. There was also the fact that they were traveling from a supply state of California to a demand state. Ms. Rojas Rosas provided me with a Montana Identification card, Mr. Santiogo-Ortiz provided me with a passport card but Mr. Marroquin and Mr. Contreras provided me with identification that had been issued in Mexico. For these reason[sic] I requested that Sergeant Wickum continue responding to my location to assist me in figuring out the situation."

30.    While ostensibly running the names of the driver and passengers for outstanding warrants, Trooper Johnson also "called Border Patrol dispatch with my duty cell and provided them with the vehicle license plate, Mr. Santiago-Ortiz, Mr. Marroquin, and Mr. Contreras Information along with the location of my stops."

31.    At about 4:06 pm, Trooper Johnson issued a $20.00 citation for failure to wear a seatbelt and a warning for the speeding.  This should have concluded the stop.   However, Trooper Johnson continued to seek information to verify the identity of the two passengers in the back seat.

32.    At about 4:18 pm, Trooper Johnson asked Ms. Rojas-Rosas "about illegal items and/or drugs being in the vehicle."   She responded that there were not.  Trooper Johnson asked for permission to search the vehicle, and according to the incident report, she agreed to allow it.

33.     After Sergeant Wickum arrived, Trooper Johnson "told Ms. Rojas Rosas that I would talk to my Sergeant and probably have my Sergeant talk to her and then I would determine if I thought a search would be necessary."

34.     According to Sergeant Wickum, "[m]y first question to [Trooper Johnson] was to clarify if he was continuing the stop because he was checking immigration status or if this was a drug stop. Trooper Johnson expressed to me that he wanted my opinion on the stop as to whether or not he should continue into the drug investigation. He told me that his 'radar is not pinging hard right now' which I took as him wanting there to be drugs in the vehicle but he was beginning to doubt it.  Trooper Johnson had contacted Border Patrol and was waiting on a call back."

35.     Seargent Wickum's report states: "The story she gave about their trip was very vague but believable given I could not speak to anyone else to corroborate what she was saying. I did not see any signs of deception when she denied having contraband in the vehicle. I explained that we would get them down the road as soon as we heard something from Border Patrol. After our visit I felt no need to continue the investigation for drugs."

36.     At 4:25 pm, Trooper Johnson's incident report states: "when Sergeant Wickum was done talking at the passenger side window, Sergeant Wickum and I talk[ed] near the right rear quarter panel of the pickup. There I informed Sergeant

Wickum that one of the occupants had something on his criminal history about illegal border crossing and Sergeant Wickum informed me [that] he had been informed that two individual[s] in the vehicle were not in the country legally. After talking with Sergeant Wickum shortly, we decided to see if Border Patrol was responding. Border Patrol said that they would check with a supervisor to see if they would respond. After getting off the phone with Border Patrol, Sergeant Wickum and I discussed if we felt a search was necessary. I personally believed that if Ms. Rojas was willing to tell Sergeant Wickum that the two back seat passengers were currently in the country illegally, she would have also told him if there were drugs in the car."

37.     The incident report continues: "Shortly after concluding a search was not necessary, at 1629 hours Border Patrol called me back to inform me that they did not currently have anyone available to respond."

38.     It was only at this point that Trooper Johnson "informed Ms. Rojas Rosas that the traffic stop was concluded and they were free to go."

39.     The records show that at 4:32 pm, Trooper Johnson faxed the information about the driver and passengers to the Havre Border Patrol station.

40.     Trooper Johnson added another paragraph to his incident report, stating that "[t]his paragraph, explaining the purpose for prolonging this traffic

stop, has been added at the request of Lieutenant Hildenstab on 20 October 2016." Counsel had asked for copies of the incident report on July 1, 2016.

41.    The final paragraph states: "The duration of this traffic stop was extended solely for the purpose of criminal and or drug interdiction. The suspicious behavior of back seat passengers led me to believe that there was more going on in the vehicle than speeding and someone not wearing a seatbelt. The poor quality of an identification card made me question whether or not I was being given a legitimate identification document. Traveling from a supply state like California to a demand state such as Montana added to my suspicions of possible drug activity. The registered owner of the vehicle was not present in the vehicle which is also an indicator of possible drug activity. Taken individually, these indicators may seem insignificant but when put into the totality of the situation, I believe they justify the additional time spent on the stop to gain the reassurance that I was not releasing a load of dangerous drug or a known criminal."

42.    On information and belief, this stop was prolonged solely to inquire with CBP about the immigration status of the individuals in the vehicle, in violation of the settlement agreement between the Montana Immigrant Justice Alliance ("MIJA") and the Montana Highway Patrol in *MIJA v. Mont. Highway Patrol*, No. 13-CV-77 (D. Mont. 2014).

43.    On information and belief, upon releasing the vehicle, the Montana

Highway Patrol trooper and/or Sherriff's officer followed the vehicle to keep track of its location for CBP. After being followed for many miles, a CBP vehicle came towards the vehicle, did a "U turn" and pulled the vehicle over.

44.     Immediately after the stop, CBP officers removed the two passengers from the back seat, handcuffed them, and placed them under arrest without any questioning. Then, the CBP officers asked the driver, Mr. Santiago-Ortiz, and the passenger, Ms. Rojas-Rosas, for their "papers." When Mr. Santiago-Ortiz showed them his valid Border Crossing Card, indicating his lawful admission as a B-2 visitor, the CBP officer incorrectly informed him that this "was garbage" because it was "only for use near the border."

45.     On information and belief, Mr. Santiago-Ortiz also showed the officers a valid I-94 arrival record, but the CBP officer claimed this was also "garbage" because it was not stamped.

46.     In reality, both of these documents were legitimate and established Mr. Santiago-Ortiz's valid admission as a visitor to the United States.

47.     With regard to Ms. Rojas-Rosas, she presented her valid Employment Authorization Card, issued to prove her DACA status. The CBP officer incorrectly informed her that this "didn't work" as proof of her lawful status. In reality, DACA recipients are issued a work authorization card as proof of their status; no

other document is issued.

48.     The CBP officers searched the vehicle and somehow came to the incorrect conclusion that Mr. Santiago-Ortiz was a "smuggler."  The couple was held for a prolonged period of time while canines arrived at the scene in and the vehicle was searched.  No weapons, contraband, or other unlawful items were found.

49.     Finally, a CBP officer informed Mr. Santiago-Ortiz that he was "the only one here legally" and that he was free to go.  However, Mr. Santiago-Ortiz asked what would happen to his wife, who was also here with valid immigration status.  The CBP officer said that Ms. Rojas-Rosas was going to be taken into custody at the Havre, Montana CBP facility.  He collected Mr. Santiago-Ortiz's phone number and said he would call with more information.

50.     At the Havre CBP facility, Ms. Rojas-Rosas was ultimately detained for over 24 hours, despite having valid federal immigration status and despite being four months pregnant.  She was interrogated multiple times throughout the night by different CBP officers.  The focus of the questions was related to alien smuggling, and if her husband had been paid to transport the passengers (his uncle and his uncle's friend).  She answered clearly and consistently that no "alien smuggling" occurred.  At some point, she was asked to sign a Record of Sworn Statement but was not given an opportunity to read it before signing it.

51.     Mr. Shahid Haque, acting as counsel for Plaintiffs, had been informed of this situation and had faxed appearance forms to the Havre CBP facility by 9:50 pm on April 12, 2016, informing CBP that he represents Ms. Rojas-Rosas.  The fax contained a cover sheet stating: "I am now representing Miriam Rojas Rosas . . . She is here under the deferred action for childhood arrivals ("DACA") program.  Therefore, please advise immediately why she is being detained."  CBP did not return any calls that night.

52.     Meanwhile, after releasing Mr. Santiago-Ortiz, he had driven to the parking lot of the CBP facility, where he awaited his wife's release.  CBP officers interviewed Mr. Santiago-Ortiz in his vehicle and took photographs of the vehicle.  Mr. Santiago-Ortiz waited for many hours before CBP eventually asked him to come inside the facility.  He was interrogated by several CBP officers and then released again.  By this point, it was very late in the night.  He left the CBP facility and was looking for a hotel for the night when he received a call from CBP.

53.     CBP then devised a ruse to bring Mr. Santiago-Ortiz back to the facility to place him under arrest.  It was around 11:00 pm when CBP called Mr. Santiago-Ortiz and claimed that his wife was going to be released, and that he needed to return to pick her up.  When Mr. Santiago-Ortiz pulled into the facility's parking lot, CBP officers were waiting and walked him into the building.  One officer asked "are you ready to have dinner with her?"  Mr. Santiago-Ortiz

answered yes.  However, as soon as he walked into the building he was informed that he was under arrest.

54.     Mr. Santiago-Ortiz was handcuffed, photographed, and booked into a detention cell.  He was interrogated at length by multiple CBP officers.  Once again, the focus of the questioning seemed to be related to allegations of payment for "alien smuggling."  Throughout the night, different CBP officers entered and left, each asking questions and making different claims about what his uncle and friend were supposedly "confessing" to them.

55.     When Mr. Santiago-Ortiz asked about his wife, and reminded the officers that she is pregnant, one CBP officer told that him she would be in jail for a long time, and would possibly have an abortion and lose the baby, or possibly have the baby in her cell without a doctor.  This caused Mr. Santiago-Ortiz substantial mental distress.

56.     The next morning, having received no response from CBP, Mr. Haque again sent a fax to the Havre CBP facility, this time informing them that he represents both Mr. Santiago-Ortiz and Ms. Rojas-Rosas.  The cover sheet stated: "Miriam Rojas Rosas has valid deferred action for childhood arrivals ('DACA') status, and therefore I do not understand on what basis she is being held.  Julio Ladislao Santiago Ortiz is the spouse of Miriam and has a visitor's visa.  From what I understand, he was asked to come pick his wife up as a pretext to arrest him

as well.  Please immediately explain why these individuals are being detained."

57.    Around 9:00 am on April 13, 2016, Mr. Haque called the Havre CBP facility and spoke to Officer David Bischoff.  Mr. Haque asked if Officer Bischoff had been able to confirm that Ms. Rojas-Rosas has valid DACA status.  He initially stated that she "appears to qualify for DACA."  Mr. Haque asked if, in fact, they were able to confirm that she *already* has DACA status.  His response was "I think he confirmed that, there were some computer snafus last night." When questioned as to why she was being held if it was confirmed she has DACA status, Officer Bischoff remarked that she "might" be a "material witness."  At that time, Mr. Haque was informed that neither Mr. Santiago-Ortiz nor Ms. Rojas-Rosas were free to leave, but were "in process" and that Ms. Rojas-Rosas would be released "soon."

58.    On the morning of April 13, 2016, Mr. Santiago-Ortiz was brought out and asked to sign some immigration documents.  When an alien is suspected of being removable, a federal immigration official issues an administrative document called a Notice to Appear, which can be filed with the Immigration Court with jurisdiction over the proceedings. *See* 8 U.S.C. § 1229(a); 8 CFR § 239.1(a).  CBP issued a Notice to Appear alleging that Mr. Santiago-Ortiz "committed or conspired to commit a human trafficking offense in the United States or outside of the United States or are have been [sic] a knowing aider, abettor, assister,

conspirator, or colluder with such a trafficker in persons."

59.     The Notice to Appear alleged that Mr. Santiago-Ortiz was inadmissible at the time of his last entry under Immigration and Nationality Act ("INA") § 212(a)(2)(H), which relates to "significant traffickers in persons" and states:

> "Any alien who commits or conspires to commit human trafficking offenses in the United States or outside the United States, or who the consular officer, the Secretary of Homeland Security, the Secretary of State, or the Attorney General knows or has reason to believe is or has been a knowing aider, abettor, assister, conspirator, or colluder with such a trafficker in severe forms of trafficking in persons, as defined in the section 103 of such Act, is inadmissible."

60.     Despite the allegations of the Notice to Appear, at 1:36 pm on April 13, 2016, Mr. Haque called Officer David Bischoff and was informed that the U.S. Attorney's office had declined prosecution of Mr. Santiago-Ortiz under 8 U.S.C. § 1324 (alien smuggling).  Mr. Haque also learned that Immigration and Customs Enforcement ("ICE") had declined to take custody of Mr. Santiago-Ortiz because he was not an enforcement priority.  Mr. Haque was informed that both Mr. Santiago-Ortiz and Ms. Rojas-Rosas would be released at the same time, later in the day.

61.     Mr. Haque was also informed that the truck they were driving would be seized, for an unknown reason.

62.     On information and belief, Mr. Santiago-Ortiz and Ms. Rojas-Rosas were released from the Havre CBP facility around 6:30 pm on April 13, 2016 — over 24 hours after being first arrested by CBP.

63.     While Mr. Santiago-Ortiz was issued a Notice to Appear, the document had to be filed in Immigration Court in order to begin removal proceedings.  On November 29, 2016, the Immigration and Customs Enforcement ("ICE") Chief Counsel's office with jurisdiction over Montana at the time (the Portland, Oregon office) called Mr. Haque to inform him that the Notice to Appear would _not_ be filed, and therefore no removal proceedings would be initiated.  The stated reason was prosecutorial discretion, and because Mr. Santiago-Ortiz was not an enforcement priority.

64.     CBP seized and kept the truck that Mr. Santiago-Ortiz was driving, and on or about April 26, 2016, it sent the owner of the vehicle, Miguel Murillo-Jimenez, a seizure notice.   The seizure notice incorrectly states that the "merchandise" was seized "at Sweetgrass, Montana on March 17, 215 [sic]."   In fact, the truck was not "merchandise" and was seized in Havre, Montana on April 12, 2016.

65.     It is axiomatic that CBP may only seize an asset if it has been used in the commission of a crime.   Immigration matters, such as grounds of inadmissibility or removability, are civil, rather than criminal, proceedings.   *See Arizona v. United States*, 132 S. Ct. 2492, 2505, 183 L. Ed. 2d 351 (2012) ("As a general rule, it is not a crime for a removable alien to remain present in the United States."); *Melendres v. Arpaio*, No. PHX-CV-07-02513-GMS, 2013 U.S. Dist. LEXIS 73869 at *60-63, 2013 WL 2297173 (D. Ariz. May 24, 2013) (local law enforcement officers cannot arrest individuals solely based on known or suspected civil immigration violations); *Melendres v. Arpaio*, 695 F.3d 990, 1001 (9th Cir. 2012) (upholding preliminary injunction).

66.     After the parties challenged the asset seizure, CBP and the U.S. Attorney's office changed course and returned the asset to its owner.   CBP initially demanded a release of liability, which the parties refused to sign.   Ultimately, the truck was returned without any signed release of liability.

67.     Although CBP only listed 19 U.S.C. § 1459 as the alleged violation of law that justified the seizure of the truck, Plaintiffs are aware that CBP sought prosecution of Mr. Santiago-Ortiz under 8 U.S.C. § 1324 — and that the U.S. Attorney's office already declined such prosecution.

68.     No violation of 8 U.S.C. § 1324 was implicated by the relevant arrests on April 12, 2016, nor was there any basis to form probable cause of such a

violation. As mentioned above, the driver of the vehicle was here with a valid and unexpired B-2 visitor's visa. His wife was (and is) here with valid DACA status. The driver's uncle, riding in the back seat, was undocumented, as was his friend who was accompanying him. However, the law in the Ninth Circuit is clear that merely driving undocumented family and friends is not a violation of 8 U.S.C. § 1324.

69. As a direct and proximate result of the unlawful and tortious conduct of the Defendants described herein, the Plaintiff have suffered forms of emotional distress damages, including severe emotional distress, including anxiety, anger, humiliation, loss of sleep, worry, and other actual losses and compensable damages.

## CLAIMS FOR RELIEF

## COUNT I- False Arrest and Imprisonment Against the United States for the Tortious Actions of its Federal Agents

70. Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

71. Defendants restrained Plaintiffs against their will, as set forth herein.

72. Said restraint was unlawful and without probable cause, as set forth herein.

73.  Defendants are liable for the tort of false imprisonment.

74.  As a result of Defendants' false imprisonment of the Plaintiffs they have suffered forms of emotional distress damages, including severe emotional distress, including anxiety, anger, humiliation, loss of sleep, worry, and other actual losses and compensable damages.    Defendants are liable to Plaintiff in tort for said losses.

## COUNT II- Intentional Infliction of Emotional Distress Against the United States for the Tortious Actions of its Federal Agents

75.  Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

76.  Defendants intentionally inflicted emotional distress upon the Plaintiffs in this case by the acts and omissions described herein.

77.  Plaintiffs suffered serious and severe emotional distress as the reasonably foreseeable consequences of the Defendants' acts and omissions, which no reasonable person could be expected to endure.   Plaintiffs continue to be traumatized by the events described herein to this day, have suffered sleeplessness, and bouts of crying, moved from Montana as a result of this conduct, and are afraid of residing lawfully in the United States. The actions of Defendants have caused them to live in continuous fear that they will be subjected to arbitrary, unreasonable, and malicious conduct at the hands of law enforcement agencies,

such as CPB.

78.  Defendants are liable to the Plaintiffs for the tort of intentional infliction of emotional distress.

79.  Plaintiffs suffered damages as a direct and proximate result of Defendants intentional infliction of emotional distress.  These include severe emotional distress, in the form of long-term anxiety and fear, anger, humiliation, loss of sleep, and worry, as described herein.

## COUNT III- Negligence Against the United States for the Tortious Actions of its Federal Agents

80. Plaintiffs hereby incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

81. CPB owed Plaintiff ROJAS-ROSAS a duty not to wrongfully and falsely disregard her status as a DACA recipient, in order to justify her detention in contravention of the law.  Plaintiff ROJAS-ROSAS status as a DACA recipient entitled her to protection from adverse actions by CPB based on her status. Plaintiff's status as a DACA recipient gives rise to a special relationship between herself and CPB for purpose of immigration law enforcement.

82. CPB owned Plaintiff SANTIAGO-ORTIZ a duty not to wrongfully and falsely disregard his status as a valid visitor to the United States, in order to justify

his detention in contravention of the law.  Plaintiff SANTIAGO-ORTIZ's status as a valid visitor entitled him to protection from adverse actions by CPB based on her status. Plaintiff's status as a valid visitor gives rise to a special relationship between him and CPB for purpose of immigration law enforcement.

83. CPB breached these duties in its arrest and detention of the above-named Plaintiffs, and in falsely informing the Plaintiffs that their status under federal immigration law was of no effect and a nullity.

84. As a result of this breach of duty, Plaintiffs were detained and suffered damages, including the emotional distress described herein.

85. Defendants are liable to the Plaintiffs for this breach of duty and all proximate losses caused thereby.

<u>**DEMAND FOR RELIEF**</u>

WHEREFORE, Plaintiffs respectfully demand judgment against Defendants awarding the following:

1. A trial on all triable issues of fact herein pursuant to the Federal Tort Claims Act;

2. Compensatory and actual damages upon proof at trial;

3. Any other and further relief that this Court deems just and proper.

Respectfully submitted this 11th day of April 2018.

By: /s/ Brian J. Miller
Brian J. Miller
Morrison, Sherwood, Wilson & Deola PLLP
401 North Last Chance Gulch
Helena, Montana 59624-0557
(406) 442-3261
bmiller@mswdlaw.com

*Attorneys for Plaintiffs*